# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**

        Plaintiff,

  v.                                **Case No. 05-CR-313**

**WALLACE A. STEWART**

        Defendant.

## RECOMMENDATION TO THE HONORABLE CHARLES N. CLEVERT ON THE DEFENDANT'S MOTION TO SUPPRESS

      On December 14, 2005, the grand jury returned a three-count indictment against Wallace A. Stewart ("Stewart"), charging him with possession of a firearm after being convicted of a crime punishable by imprisonment for a term exceeding one year (count one); possession of cocaine with the intent to distribute (count two); and possession of a firearm in furtherance of a drug trafficking offense (count three). Stewart has filed a motion to suppress the evidence specified in the indictment, which was seized on August 21, 2005 as a result of a traffic stop by Milwaukee County Sheriff's detectives.

      This court conducted an evidentiary hearing to address Stewart's motion to suppress on January 12, 2006. Stewart appeared in person and by his counsel, Attorney Nancy Joseph of the Federal Defender Services of Wisconsin. The government appeared by Assistant United States Attorney Kelly Brown Watzka. The parties filed post-hearing briefs on the motion, which is now ready for resolution. A jury trial is scheduled to commence before the Honorable Charles N. Clevert on March 3, 2006, with a final pretrial conference set for February 28, 2006.

# EVIDENTIARY HEARING TESTIMONY

Appearing and testifying at the evidentiary hearing on behalf of the government was Milwaukee County Sheriff's Detectives Denny Galipo ("Detective Galipo"), Daniel Hughes ("Detective Hughes"), and Robert Dickerson ("Detective Dickerson"). Detectives Galipo and Hughes testified regarding the traffic stop, their subsequent interaction with Stewart, and the search of Stewart's person and vehicle. Detective Dickerson, an officer of the Sheriff's canine unit, offered testimony regarding his search of Stewart's vehicle after being summoned to the scene by Detectives Galipo and Hughes. Stewart presented no witnesses. Accordingly, a summary of the relevant events from the detectives' perspective follows.

On August 21, 2005, Detectives Galipo and Hughes were patrolling in a high crime area of the northwest side of Milwaukee. When the detectives reached an intersection, they observed a Buick Roadmaster in front of them make a sudden left turn without signaling and without being in the designated left-turn lane. (Tr. 10-11, 67.). This caught the detectives' attention, and they decided to follow the Buick. Detective Galipo, who was driving the detective's patrol vehicle, testified that he caught up to the Buick and paced it for two blocks. See Hrg. Ex. 1. Detective Galipo estimated that the Buick was traveling approximately fifty miles per hour, which exceeded the speed limit at that location. (Tr. 11-14, 43-44, 67.).

One block later, based on the illegal left turn and speeding, Detective Galipo activated his squad lights to stop the Buick. Rather than immediately pulling to the side of the road, the driver of the Buick proceeded for approximately one block before stopping. (Tr. 16, 70.). Once the Buick pulled to the side of the road, Detectives Galipo and Hughes observed the driver lean back and reach down to his right. Both detectives testified that, based upon their experience, this action, referred to

2

as "dipping," commonly indicates that a person is either hiding or retrieving something within the car. (Tr. 18, 72.).

As they approached the Buick, the detectives noticed a strong odor of what they believed to be marijuana. (Tr. 19, 73.). Detective Galipo approached the driver, asked for his identification, advised the driver of the reason for the traffic stop, and told the driver that he smelled marijuana. (Tr. 20-21, 49-50.). During his interaction with Detective Galipo, the driver, who was then identified as Stewart, appeared to be perspiring, rubbing his hands on his shorts, and avoiding eye contact. (Tr. 22.). Based on these observations, Detective Galipo believed that Stewart was acting unusually nervous, asked Stewart why he was so nervous, and received no response. (Tr. 22-23.).

At that point, Detective Galipo asked Stewart to step out of the Buick and place his hands on the roof. In light of the "dipping" observed prior to the stop, the marijuana odor, and Stewart's nervous actions, Detective Galipo testified that he believed a pat-down search was necessary to check for contraband or possibly a weapon. (Tr. 22, 51.). As Detective Galipo began the pat-down, Stewart began to fidget and move his head. (Tr. 23-24.). In addition, Stewart frequently looked back at Detective Galipo, giving what the detectives referred to as "target glances." Based on their training and experience, this raised the detectives' suspicions because target glances commonly indicate that a suspect might flee or assault the officer. (Tr. 23-24, 75.).

During the pat-down, Detective Galipo felt a "wad" in the pocket of Stewart's shorts. Galipo recovered two wads of money in Stewart's pockets. However, because Stewart's fidgeting increased, Detective Galipo was unable to continue the pat-down search without restraining Stewart further. (Tr. 25.). Accordingly, in an effort to restrain Stewart's resistance, Detective Galipo then tried to handcuff Stewart. (Tr. 24-25.). As he attempted to do so, Detective Hughes was positioned on the opposite

side of the vehicle where he could monitor the vehicle passenger. Detective Hughes testified that he noticed Stewart's behavior and advised Stewart to "stop resisting or you will be tased." (Tr. 24, 76.). After this warning, Detective Galipo was able to handcuff Stewart and continue the pat-down search. (Tr. 26, 76.). However, based on Stewart's behavior, Detective Hughes radioed for backup. (Tr. 76.). Stewart then persisted in fidgeting after being handcuffed and, in Detective Galipo's opinion, repeatedly moved his hips to prevent a thorough search of his crotch area. (Tr. 26, 77.). Detective Galipo testified that these movements raised further suspicions because, in his training and experience, people commonly hide contraband in their waistband, crotch area, or inner thigh. (Tr. 26.).

At some point before the pat-down was complete, Stewart attempted to flee by twisting away from Detective Galipo and running toward the street. (Tr. 27, 78.). Detective Galipo grabbed hold of Stewart and, with Detective Hughes' assistance, pulled Stewart out of the street and down on the sidewalk. (Tr. 27, 54-57, 78.). By the time that Stewart was under control, other officers had arrived at the scene and monitored the vehicle passenger. Because he was concerned that Stewart might still be concealing something, Detective Hughes completed the pat-down of Stewart—who continued to resist by moving and raising his legs—and then placed Stewart in the back of his patrol vehicle. (Tr. 29-31, 78.).

Shortly thereafter, Detective Dickerson, a member of the canine unit, arrived at the scene and escorted his drug dog around the exterior of Stewart's vehicle. (Tr. 30, 80, 111-12.). Detective Dickerson testified that his drug dog alerted to the presence of narcotics near the driver's side door of the car. (Tr. 112.). Detective Dickerson then continued to circle the car and allowed the dog to enter the vehicle. It appeared to Detective Dickerson that the drug dog initially wanted to go into the back seat but was unable to do so because that area was piled with bags, boxes, a fan, and other

4

personal belongings. (Tr. 113-15.). Instead, the drug dog went immediately to the area between the driver's seat and the passenger's seat and indicated the presence of narcotics at that location. (Tr. 113, 115.). Detective Dickerson removed the dog from the vehicle and retrieved what appeared to be a marijuana cigarette from the location indicated by the dog. (Tr. 113-14.).

After Detective Dickerson recovered the marijuana, Detectives Galipo and Hughes began a more thorough search of the Buick. (Tr. 32.). They discovered a firearm under the passenger's seat where they previously observed Stewart reaching back or "dipping," prior to approaching the Buick. (Tr. 32-34, 59, 82.). By this time, the traffic stop had drawn a crowd. For that reason, and in light of the many belongings in the backseat, Detectives Galipo and Hughes decided that it would be safer to finish the vehicle search elsewhere. (Tr. 37, 82-83.). Accordingly, one of the other officers on the scene drove the Buick to the Milwaukee County Sheriff's garage, and Detectives Galipo and Hughes took Stewart to their office for further questioning. (Tr. 37, 83.). As part of their standard operating procedures, in effort to ensure that a suspect does not have contraband or a weapon, Detectives Galipo and Hughes conducted a full body search of Stewart prior to his interview. (Tr. 38, 84.). This search revealed that Stewart had a bag of cocaine hidden in his crotch area, under two pairs of underwear. (Tr. 38-39, 85.). Detectives Galipo and Hughes also conducted the subsequent search of Stewart's vehicle, which revealed two digital scales and a second bag of cocaine. (Tr. 87-90.).

## STEWART'S POSITION

Stewart argues that the cocaine and firearm seized by the detectives should be suppressed because: (1) the initial stop of his vehicle was unlawful; (2) the search of Stewart's vehicle after the occupants were removed was unlawful; and (3) the items recovered during the subsequent search of his person and vehicle were the fruit of Stewart's unlawful arrest.

5

## ANALYSIS

In addressing the legality of the detectives' actions under the Fourth Amendment, this court asks two questions: (1) did the detectives have at least a reasonable suspicion that Stewart committed an offense when the traffic stop was initiated and (2) were the detectives actions reasonably related in scope and duration to circumstances that justified the stop or that arose thereafter. The court answers each question affirmatively and will recommend that the motion to suppress be denied.

### I. Traffic Stop

In his first argument, Stewart suggests that the traffic stop was not the result of traffic violations. In support of this claim, Stewart says that his vehicle would have immediately been stopped if he had made an illegal left turn and was speeding, as Detectives Galipo and Hughes claim.

The court finds this argument unpersuasive. According to the undisputed testimony at the evidentiary hearing, Detective Galipo activated the siren to stop Stewart's Buick within a block of determining that Stewart was speeding. While the detectives did not activate their siren while Stewart was stopped at a controlled intersection (Tr. 15-16.), it is clear that the traffic stop was initiated as soon as practicable. Moreover, waiting a few seconds to initiate the stop after determining that Stewart was speeding does not support the extreme inference that the detectives lied about their motive for the stop. In fact, Detectives Galipo and Hughes, who were sequestered during the hearing pursuant to Rule 615, Fed. R. Evid., gave consistent and detailed testimony about their observations of Stewart's vehicle, the left turn that drew their attention, the location where Stewart was paced, and Stewart's excessive speed. Stewart presented no opposing testimony at the evidentiary hearing and has not suggested any alternate motive for the traffic stop in his post-hearing brief. In fact, in arguing

6

that the subsequent search of his vehicle was not legally justified, Stewart points out that the detectives had no prior knowledge of him or his vehicle. For all of these reasons, the court finds that the detectives stopped Stewart based on probable cause that Stewart committed traffic violations. Accordingly, with respect to Stewart's first claim, the court will recommend that the motion to suppress be denied and will turn its attention to the search of Stewart's vehicle and person.

## II. Detention, Pat-down, and Vehicle Search

Stewart's remaining arguments focus on the events that occurred after the detectives initiated the traffic stop. In the opinion of this court, the detectives' detention of Stewart, pat-down search, and vehicle search were conducted reasonably and were based upon probable cause. Probable cause is particularly important in this case because the automobile exception allows a warrantless search and seizure of a car if probable cause exists. United States v. Rivera, 825 F.2d 152, 158 (7th Cir. 1987)(citing California v. Carney, 471 U.S. 386 (1985); Chambers v. Maroney, 399 U.S. 42 (1970); Carroll v. United States, 267 U.S. 132 (1925)). Law enforcement official have probable cause where "'the facts and circumstances within their knowledge and of which they have reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the suspect committed or was committing an offense.'" United States v. Jones, 72 F.3d 1324, 1331 (7th Cir. 1995)(citing United States v. Levy, 990 F.2d 971, 973 (7th Cir. 1993)).

Once the detectives approached Stewart's vehicle, their level of suspicion quickly and reasonably escalated. Detectives Galipo and Hughes both testified that they immediately smelled a strong odor of marijuana emanating from Stewart's vehicle. This observation, coupled with the "dipping" that occurred prior to the detectives approaching the vehicle, Stewart's uncommonly nervous behavior, and Stewart's failure to answer Detective Galipo's question about the marijuana

7

odor constitute probable cause to believe that Stewart or his passenger might possess marijuana, or that marijuana would be found in Stewart's vehicle. Accordingly, Detective Galipo could have searched Stewart's vehicle at that point, pursuant to the automobile exception to the search warrant requirement. The less intrusive pat-down search that Detective Galipo conducted was certainly reasonable.

In conducting the pat-down search, there is no indication that Detective Galipo acted in an untimely or overly-intrusive manner. In fact, Detective Galipo testified that only a few minutes lapsed between his initial contact with Stewart and the arrival of backup officers. (Tr. 30.). In addition, although Stewart was initially handcuffed and later physically restrained on the ground, the parties do not dispute that Stewart: (1) was discovered to be carrying large sums of money, (2) resisted the pat-down search, (3) was warned that he must comply with the pat-down search or be tased, (4) gave target glances, indicating to the detectives that he might assault them or attempt to flee, (5) eventually did attempt to flee, and (5) later continued to resist the pat-down search. Under those circumstances, the officers were certainly justified in taking the measures they did to complete what could have been a minimally intrusive pat-down search.

By the time the pat-down was complete, the probable cause that existed during the detectives' initial interaction with Stewart was heightened by Stewart's resistance and attempt to flee. At that point, the detectives placed Stewart under arrest and held him in their patrol vehicle. The arrest itself constitutes an alternate basis for a thorough search of Stewart and his vehicle. United States v. Trigg, 878 F.2d 1037, 1039 (7th Cir. 1989)(under search incident to arrest exception to warrant requirement, police officer may thoroughly search the person of a suspect after making a custodial arrest); New York v. Belton, 453 U.S. 454, 460 (1981)(when the occupant of a vehicle is arrested, police may

8

search the interior of the vehicle as a search incident to arrest); United States v. Arango, 879 F.2d 1501, 1505 (7th Cir. 1989)(vehicles may be searched incident to lawful arrest, without regard to extent to which defendant has been secured prior to search).  Moreover, once Detective Dickerson arrived with his canine, he immediately discovered marijuana in the vehicle, and Detectives Galipo and Hughes discovered a firearm at the precise location where they observed Stewart "dipping."  In light of these many considerations—in addition to the large quantity of belongings in the car, the crowd that had gathered to watch the traffic stop, and the fact that the traffic stop occurred in a high crime area—it was reasonable for the officers to take Stewart's vehicle to their garage for further inspection.

The detectives' subsequent search of Stewart prior to his interview was permissible because Stewart continued to resist the detectives, leaving them concerned that Stewart might still possess contraband.  In addition, the search was permissible as a routine inventory or booking search, necessary for the detectives' protection during the interview.  See Illinois v. Lafayette, 462 U.S. 640 (1983); United States v. Jackson, 377 F.3d 715, 716 (7th Cir. 2004)("it is reasonable for the police to search the body, clothing, and immediate possessions of anyone in custody following an arrest on probable cause.").

Thus, for all of the reasons discussed herein, the court concludes that there is no basis to suppress the firearm and cocaine specified in the indictment and will recommend that Stewart's motion be denied.

**IT IS THEREFORE RECOMMENDED** that Stewart's motion to suppress be **denied.**

Your attention is directed to 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Criminal Procedure 59 (b)(2), and General Local Rule 72.3 (E.D. Wis.); whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation.

9

Case 2:05-cr-00313-PP     Filed 02/01/06     Page 9 of 10     Document 17

Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

Dated at Milwaukee, Wisconsin this 1st day of February, 2006.

s/AARON E. GOODSTEIN
United States Magistrate Judge